**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PETE'S BIG TVS, INC.,

    Plaintiff

v.

AG LIGHT AND SOUND INC.,

    Defendant

Case No.: 2:24-cv-00315-APG-NJK

**Findings of Fact and Conclusions of Law**

I conducted a bench trial January 6 and 7, 2026.  Below are my findings and conclusions as required under Federal Rule of Civil Procedure 52(a).

**I.  FINDINGS OF FACT**

Plaintiff Pete's Big TVS, Inc. (PBTV) is a Delaware corporation.  Defendant AG Light and Sound, Inc. is a Nevada corporation.  Neither party objects to personal or subject matter jurisdiction or venue.

AG specializes in lighting, audio, video, staging, and design for live music events and festivals around the country.  PBTV rents LED and video display equipment to production companies such as AG.

Prior to 2022, AG had rented video panels from PBTV on more than a dozen occasions.  In their prior dealings, the parties would negotiate a verbal agreement, which PBTV would memorialize in invoices.  There was no master lease agreement between the parties.

In the spring of 2022, Andrew Gumper, the owner of AG, contacted Peter Daniel, the owner of PBTV, about renting LED panels to build video walls for two music festivals: the main stage at the Ultra Music Festival in Miami, held from March 25 to 27, 2022; and the Coachella festival in Indio, California, held from April 14 to 21, 2022.  Gumper described the video walls it

needed to create and sent Daniel a rough sketch.  AG relied on PBTV to select the panels and equipment to use.  PBTV did not have enough inventory to provide AG with all of the same panels.  Instead, it offered to provide two different types of panels that PBTV said could be locked together and perform as if they were the same types.  PBTV provided AG a video example of some of the different panels locked together and playing content. Exh. 513.  That video seemed to confirm that the different panels would work together to create the large video walls AG needed to build.  Based on that video and PBTV's assurances that the panels would work together, AG agreed to rent the two different types of panels from PBTV.  In total, AG rented 1,296 panels from PBTV, plus necessary equipment and accessories.

Because AG would use the panels for two weekends during Coachella, the parties agreed AG would pay more for that festival.  Due to the short time between the festivals, the parties also agreed AG would keep all the panels until after Coachella.  The parties agreed that PBTV would invoice AG separately for the two shows.  Gumper testified he agreed to pay for the Ultra rental as soon as he received the invoice, and then pay for Coachella out of the proceeds he received from Ultra.  Daniel testified Gumper agreed to pay the Ultra Invoice C.O.D., but he acknowledges AG did not pay upon delivery and PBTV did not demand it.

Daniel testified he agreed to charge AG $35,000 for Ultra and $55,000 for Coachella.  PBTV memorialized the agreement by issuing a Quote for the Ultra festival and two separate Invoices.[1]  However, PBTV created various additional invoices, some of which were for a deposit that PBTV never requested.  Daniel acknowledged that several of these invoices were mistakes or created as defaults under its bookkeeping system.  It is unclear when those various

---

[1] Exhibits 505, 507, and 508 appear to be the Quote and Invoices memorializing Daniel's understanding of the parties' agreement.

2

invoices were created and when they were sent to AG (if at all).

The Ultra Quote detailed separate prices for the panels and each piece of equipment, then applied various discounts to reach a final price of $35,000. Exh. 505.  No Quote was provided for Coachella.  Gumper testified he agreed to pay $30.00 per panel, which included all necessary accessories and equipment.[2]  Gumper acknowledges receiving either the Quote or the Invoices (he was not sure which he actually received) around the time he was setting up the Ultra festival but did not review them until after that festival.

AG had significant difficulties setting up the panels[3] for Ultra, and the panels performed poorly during the festival.  The color, brightness, and appearance of the different panel types did not match as they had on PBTV's pre-rental demonstration video.  Gumper testified he tried to contact Daniel when he experienced problems setting up for Ultra but received no response.  AG employee Andrew Sclafani texted with PBTV employee Jack Miller during the Ultra installation and told him about the problems, but Sclafani did not ask for or receive any suggested solution from Miller. *See* Sclafani deposition at 67.  AG worked before, during, and between Ultra shows trying to swap panels and fix the problems, to no avail.  The festival organizers, performers, and audience members complained about the poor quality of AG's video walls.  Gumper spoke with Daniel the following week, but Daniel said "I told you they were different" and offered no fix or discount.

---

[2] That rate would yield a higher price for both Ultra ($38,880) and Coachella ($58,320 at 1.5 times the Ultra price) than PBTV charged in the Quote and Invoices ($35,000 and $55,000).

[3] My reference to "panels" in this order includes the related equipment (e.g., cards, frames, cabling, etc.).

AG did not have sufficient time between Ultra and Coachella to swap out panels and fix the problems.  Because Coachella required fewer panels in a different arrangement, AG was able to hide the differences, which made the problems less obvious.

PBTV contends that when AG returned the panels and equipment after Coachella, the panels were caked in dust and required significant effort and cost to clean them.

PBTV invoiced AG for a higher amount, which eliminated the discounts shown in the Quote and included a $5,600 cleaning fee and interest compounded daily. Exhs. 3, 4.  PBTV had never charged AG for cleaning or interest on any of its prior rentals, including when AG used PBTV panels at Coachella in previous years.

As a result of the poor quality of its video walls at Ultra, AG had to give the Ultra organizers a $100,000 discount for the next year's festival and lost the ability to contract for a video wall on the Ultra main stage going forward.  AG estimates the loss of the Ultra main stage opportunity deprived it of $250,000-$300,000 in profit each year thereafter.  As for Coachella, AG's contract expired after 2022 and was not renewed.  While AG believes that was due to the poor quality of its 2022 production, there is insufficient proof of that.  AG also suffered damage to its reputation.

AG received some benefit from using the panels.  It was able to fulfill its obligations on the Ultra and Coachella festivals.  They clearly were not AG's best productions and caused AG consequential damages.  But at least AG did not totally breach its contracts with the festival producers, was paid for those events,[4] and avoided lawsuits from show producers.

---

[4] AG had been prepaid for Ultra because it had been paid for the 2020 show that was canceled because of Covid.  Ultra was required to apply that payment to the 2022 Ultra show.

4

AG did not pay PBTV for the panel rentals because of the problems it experienced and because it lost significant business as a result.  PBTV sues AG for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Unjust Enrichment.  AG asserts no counterclaims.

## II.  CONCLUSIONS OF LAW

This court has diversity jurisdiction over the subject matter of this case. 28 U.S.C. § 1332.  Venue is proper as AG is a Nevada corporation based in the federal District of Nevada. 28 U.S.C. § 1391(b)(1).

PBTV first asserts a claim for Breach of Contract. ECF No. 1 at 3.  "To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the defendant breached, and (4) that the breach caused the plaintiff damages." *Iliescu, Tr. of John Iliescu, Jr. & Sonnia Iliescu 1992 Fam. Tr. v. Reg'l Transp. Comm'n of Washoe Cnty.*, 522 P.3d 453, 458 (Nev. App. 2022).  Under the Nevada version of the Uniform Commercial Code, a lease contract is not enforceable unless "[t]here is a record, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term." Nev. Rev. Stat. § 104A.2201(1)(b).  If there is no signed writing, a lease contract may still be enforced "[w]ith respect to goods that have been received and accepted by the lessee." *Id*. § 104A.2201(4)(c).  Similarly, a "lease contract may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a lease contract." *Id*. § 104A.2204.  Here, the Quote and Invoices described the leased equipment and term of the lease.  AG did not sign the Quote or Invoices, but

it accepted and used PBTV's panels.  Thus, the parties entered into a valid lease contract for the panels.

PBTV's creation of the pre-rental video (Exh. 513) created an express warranty of fitness. *Id*. § 104A.2210(1)(c) ("Any sample or model that is made part of the basis of the bargain creates an express warranty that the whole of the goods will conform to the sample or model.").  At a minimum, PBTV owed an implied warranty of fitness for a particular purpose because it knew AG's intended use for the panels and AG relied on PBTV's judgment to select the panels for the project. *Id*. § 104A.2213 ("[I]f the lessor at the time the lease contract is made has reason to know of any particular purpose for which the goods are required and that the lessee is relying on the lessor's skill or judgment to select or furnish suitable goods, there is in the lease contract an implied warranty that the goods will be fit for that purpose").  The relevant documents contain no disclaimer, exclusion, or modification of any warranties, as would be required under Nevada Revised Statutes § 104A.2214.

PBTV breached its contractual obligations and warranties to AG.  Its panels did not perform as PBTV represented and as the parties intended.  AG received complaints from Ultra's organizers, artists, and audience members.  Despite AG's best efforts, the problems persisted throughout the show weekend.  As a result, AG suffered consequential damages: it had to give the Ultra organizers a $100,000 discount for the 2023 festival, it lost the opportunity to contract for the video wall on the Ultra main stage going forward, and it suffered harm to its reputation.  AG estimates the loss of the Ultra main stage deprived it of $250,000-$300,000 in profit each year thereafter.

If a lessee is damaged by the lessor's breach of a lease, the lessee is entitled to recover incidental and consequential damages. *Id*. §§ 104A.2508, 104A.2519, 104A.2520.  Although AG

asserts no counterclaim against PBTV, it asserts offset as an affirmative defense. ECF No. 11 at 6 ¶25 ("Plaintiff has breached its agreement with Defendant, and consequently, Defendant is entitled to offset the damages suffered by Defendant against Plaintiff's claims.").[5]  Gumper's and Sclafani's communications with Daniel and Miller, respectively, during and after the Ultra installation satisfy the reasonable notice requirement of Nev. Rev. Stat. § 104A.2516(3)(a).

Because PBTV breached its contractual obligations and warranties, it is not entitled to prevail on its Breach of Contract claim. *Cain v. Price*, 415 P.3d 25, 29 (Nev. 2018) ("[O]ne party's material breach of its promise discharges the non-breaching party's duty to perform. . . . Thus, the injured party is both excused from its contractual obligation and entitled to seek damages for the other party's breach." (simplified)).  Even if PBTV did not technically breach, the failure of its panels to properly perform caused AG consequential damages, which AG may offset against PBTV's damages.  AG's consequential damages exceed the amount PBTV seeks to recover in this case.  Therefore, I deny PBTV's Breach of Contract claim.

PBTV also asserts a claim for Breach of the Implied Covenant of Good Faith and Fair Dealing. ECF No. 1 at 3.

> The covenant protects against arbitrary or unfair acts by one party that work to the disadvantage of the other. . . . When one party literally complies with a contractual term, it may breach the implied covenant of good faith and fair dealing if it nevertheless deliberately countervenes the intention and spirit of the contract.

---

[5] *Clark Cnty. Sch. Dist. v. Richardson Const., Inc.*, 168 P.3d 87, 95 n.21 (Nev. 2007) ("A defense of offset must also be pleaded affirmatively." (citations omitted)); *cf. Aviation Ventures, Inc. v. Joan Morris, Inc.*, 110 P.3d 59, 63 (Nev. 2005) ("Setoff is an equitable remedy that should be granted when justice so requires to prevent inequity.  Setoff is a form of counterclaim which a defendant may urge by way of defense or to obtain a judgment for whatever balance is due." (simplified)).

*Virgin Valley Water Dist. v. Paradise Canyon, LLC*, 567 P.3d 962, 970 (Nev. 2025) (simplified). PBTV's complaint nakedly alleges that "AG has breached its agreement with PBTV and has acted in bad faith towards PBTV in violation of the implied covenant." ECF No. 1 at 3.  PBTV neither pleaded nor offered at trial any evidence of any potential breach other than AG's failure to pay, which would be a breach of the contract not of the implied covenant.  But I have ruled that AG did not breach the contract when it refused to pay.  And PBTV presents no evidence that AG violated the intention or spirit of the contract.  Therefore, I dismiss this claim as well.

Finally, PBTV asserts a claim for Unjust Enrichment. ECF No. 1 at 4.  "An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).  Because PBTV and AG were parties to an express, written contract, I dismiss PBTV's claim for Unjust Enrichment.

I THEREFORE ORDER that defendant AG Light and Sound, Inc. is entitled to judgment on all claims asserted against it in this case by plaintiff Pete's Big TVS, Inc.  The clerk of court is ordered to enter judgment accordingly and close this case.

DATED this 17th day of March, 2026.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE